## JAMES FAIRFIELD v. WYOMING V. COAL CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY.

Argued April 16, 1891—Decided May 18, 1891.
[To be reported.]

(a) The employees of a coal company, mining coal for it with the assistance of laborers employed by themselves, "turned in" to the com-

Statement of Facts.

pany, monthly, statements of the time made and wages earned by their laborers, and on its regular pay-days the company paid such wages directly to the laborers, out of moneys in its hands due the miners who employed them:

1. Such being the established usage and method of conducting the business, the "turning in" of the laborer's time by the miner was in legal effect an order on the company to pay to the laborer the amount due him from the miner: Plymouth Coal Co. v. Kommiskey, 116 Pa. 365; and the acceptance thereof was an undertaking to pay at the regular pay-day.

2. As the rights of the laborer, under such an order, are not superior to those of his employer, the miner, he cannot maintain an action for its amount against the coal company prior to the pay-day on which the moneys of the miner, out of which it is to be paid, become due, even though he may have quit the service of the miner nearly twenty days before such pay-day.

Before Paxson, C. J., Sterrett, Green, Clark and Williams, JJ.

No. 268 January Term 1891, Sup. Ct.; court below, No. 462 January Term 1890, C. P.

On January 11, 1890, there was entered in the court below, by appeal from the judgment of an alderman, an action for wages brought on December 5, 1889, by James Fairfield, by his next friend Henry Conyard, against the Wyoming Valley Coal Company. The defendant pleaded non-assumpsit.

At the trial, on March 12, 1890, the following facts were shown:

Among the miners employed by the defendant company operating a colliery was William Dennis. The uniform manner in which the defendant's miners were employed was that the miner contracted with the company to do the mining of coal for a specified price by the quantity, such price covering all the labor, etc., required to get the coal out. The miner would then hire his own laborers or helpers, who would be compensated out of the moneys payable upon the contract between the company and the miner. The payment of the laborers employed by the miner was regulated, however, by a usage to the following effect: About the first of each month the miner "turned in" to the company a statement of the wages earned by his laborers during the preceding month. The company then deducted the amounts so turned in from the sum its accounts showed to

be due to the miner upon his contract, and paid directly to the laborers the amount of such deductions, paying to the miner the remainder of the contract price of the mining done. These payments were made on the regular pay-day, to wit, the Saturday nearest to the twentieth day of the month succeeding that in which the moneys were earned. In the interval between the first and the twentieth of the month, the company's clerks would make up accounts showing the amounts payable to the miners and laborers, respectively, for the work of the preceding month.

William Dennis testified for the plaintiff that he was told by the defendant's foreman to hire a laborer, and that he hired the plaintiff, who was his brother-in-law, agreeing to pay him wages at the rate of $1.50 per day. The plaintiff worked in the capacity of a laborer for Dennis during the month of October, 1889, and, on the regular pay-day in November, received the amount of his wages from the defendant in accordance with the usage above stated. He continued to work during the month of November, 1889, and his wages earned in that month amounted to $24. About December 2d, Dennis turned in to the company a statement of those wages. On the same day, or the day after, the plaintiff quit working for Dennis, went to the office of the defendant, and demanded payment of the $24 due him, saying that he was going away and wanted his money. The defendant's superintendent replied he would advance the balance coming to the plaintiff, if the latter would cause to be turned in, for deduction from the $24 claimed, a board bill owing from the plaintiff to Dennis. This proposition being declined, the superintendent refused to pay the plaintiff anything. The plaintiff testified that the reason given for wishing the board bill turned in, was that Dennis was indebted to Harvey Yeager, the storekeeper, and it was desired to apply the amount of the board bill to that debt. On cross-examination, the superintendent was asked: " Q. The truth is you wanted to protect Harvey Yeager, did you not? A. Yes, we did."

Dennis, testifying for the plaintiff, was asked whether the custom of the company to pay its men, on the regular pay-day, for the work done in the preceding month, did not apply only in case the miner or laborer continued in the employ of the company. " A. Of course, that is where it is. If the laborer con-

Charge of Court below.

tinues in the employ, they pay you the money the following 20th. Q. But if he leaves the company? A. If he leaves the company, they pay him. There was a man got his pay the very day before I left the company, got his pay in full; and they would not pay them boys. Q. And that is customary with the company, that when a man leaves the company they pay him then? A. Certainly, yes." Cross-examination: "Q. The reason why you say it is customary for the company to pay a man when he quits, no matter when he quits, is because you know of a man who got his pay the day before you quit? A. Yes, sir, and I got my pay there before. Simply because they were small boys, he would not pay them; but if they had been a man he would have paid them."

At the close of the testimony, the court, WOODWARD, J., charged the jury in part as follows:

So far as the facts of this particular case are concerned, there is very little dispute or difference. It is not denied that the plaintiff was employed by one Dennis, who was a miner for defendant company, as his laborer in these particular mines; nor is there any dispute about the amount which the laborer earned by his work for the month of November, 1889, at the rate of one dollar and a half per day. The controversy really arises out of this question: Whether the custom of paying the miner on what is known as pay-day, which occurs about the twentieth of the month, is applicable to this case, so that the plaintiff had no legal claim for these wages for which he could bring an action, until the arrival of the next pay-day after he ceased work in these mines.

Now, there are two views of such a question, to be taken in any comprehensive discussion of the points involved. As most of you are well aware, the mining of coal is generally done under a contract between the employer and the miner, as to the price which the latter shall receive by the car or quantity for the coal mined. In other words, the owner or employer contracts with the miner for the mining of the coal; the miner employs his own laborer and out of the pay he receives from the employer, he compensates his laborer. In other words, there is no relation of contract, as a general rule, in the mining region, between the laborer and the company or the employer.

Charge of Court below.

The bargain is between the miner and the employer, for the mining of the coal, and the miner makes his own contract or bargain with the laborers, who do the work of putting the coal into the cars, and other labor necessary. So that, in the absence of any custom to the contrary, making the law of the relation, a laborer who has earned a certain amount of money must look to the miner for his compensation, and not to the employer of the miner.

But, gentlemen, there has grown up in this mining region a custom, or practice, or usage which is tantamount to law, of this kind: That at certain collieries the contract or arrangement is that while the company pays the miner and bargains with him for the mining of the coal, it is also provided, for reasons of mutual convenience or benefit, that the miner shall return, or "turn in," as it is called, every month to the employer, the amount due the laborer, and that then the employer shall pay that amount, not to the miner, but to the laborer himself. And where this custom is established clearly, and has become uniform and well known, it becomes, in our judgment, the law of the relation between the laborer and the employer. And while, in the absence of such a custom, the laborer must needs look to the miner for his pay, in the presence or existence of such a usage or custom, the laborer may have a legitimate claim for his wages directly upon the common employer. Another custom, which amounts to a law, practically, in this mining country, is this: That the wages or pay due the miner from the employer, as we have already said, is not payable at the end of the month, but is to be paid at the next pay-day, which, as we understand it, occurs about the twentieth of the following month. So that, practically, the company or employer is always two thirds of a month behind in making a payment to the miner or laborer. . . . .

Now in our judgment, gentlemen of the jury, this custom of paying once a month, on or about the twentieth, the wages earned during the preceding month, where it has been agreed to and practiced under by the miner and employer, becomes also the law of the relation. It, no doubt, had been found necessary that the employer should have a certain amount of time to examine the accounts, to post the books and to make the arrangements for paying the miner, for the work done dur-

Charge of Court below.

ing the preceding month.   [But, gentlemen of the jury, in our judgment this custom or rule, while having the force of law, so long as the workman remains in the employment of the employer or company, is no rule of action to be enforced by a court when the relation of employer and employee terminates and ceases.   In other words, the rule is applicable to the parties while the relation lasts of employer and employee.   But, if for any reason the relation terminates, and there is a certain amount of money due the employee for wages, then and in that case it becomes immediately payable, and the employee is not obliged to wait two thirds of a month later, if he wishes to remove elsewhere or seek other employment.] [1]   This, in our judgment, after a careful consideration, is the fair and just exposition of the law on this subject; and, of course, it controls our judgment in this case. . . . .

Before referring to the points, gentlemen, [I would say furthermore, as a portion of my general charge, that there is some evidence in this case, namely, the testimony of William Dennis, to this effect: That the rule in question in regard to monthly payments, did not apply to a man who left the company's employment.   In such a case, he says they pay when he leaves.   That is in this record.   Nor is there any evidence on the part of the defendant to the contrary.] [2]   It is furthermore in the evidence that when the plaintiff asked for his pay, Mr. Smith, the superintendent of the company, declined to pay him, or advance the money to him, to use his language, unless he would leave behind a sufficient sum to pay the board bill, some fifteen or eighteen dollars.   There is no evidence that the boarding-house keeper claimed this money, or claims that it should be retained, or that there was any contract between the parties to that effect.   [Nor is there any evidence that Mr. Smith, on behalf of the company, declined to pay because the monthly pay-day had not come around.] [3]   That was not the reason assigned.

I am requested by the counsel for the defendant to charge you on several written points, which I now propose to read:

1. From the undisputed evidence in the case, the plaintiff was an employee of a miner named William Dennis and not of the defendant, and the verdict of the jury should be for the defendant.[4]

Charge of Court below.

2. There has been no contract shown between the plaintiff and the defendant, and therefore, there can be no recovery.[5]

3. There has been no such custom shown as would render the defendant liable to the plaintiff, and therefore, there can be no recovery.[6]

4. The turning in of the laborer's time by the miner is, in legal effect, an order on the company to pay the amount to the laborer.[7]

5. If any liability arises on the part of the company, it is because their general mode of doing business amounts in law to an acceptance of the miner's order.[8]

6. Under the undisputed evidence, the general mode of doing business is to pay for the time turned in, the next succeeding pay-day. The acceptance is therefore a qualified or conditional acceptance, to wit, to pay at a fixed time in the future; and, suit having been brought by the plaintiff before the arrival of that time, it is premature and there can be no recovery therein.[9]

7. Under the undisputed evidence of the miner, the miner would not receive his pay until the next succeeding pay-day; an order by him and an acceptance by the company, payable out of moneys to be received by him on pay-day, would not render the company liable until pay-day, and suit having been brought before that time, it is premature and there can be no recovery therein.

8. Under the undisputed evidence, the order by the miner and the acceptance by the company were by parol; the amount of said order being more than twenty dollars, the company defendant are in no event liable as acceptors, and there can be no recovery in this case.[10]

9. Under the undisputed evidence in the case, the plaintiff was not an employee of the company defendant.[11]

Now, gentlemen of the jury, while there are some statements of fact and law, in these points, which we might assent to and affirm, under the general view which we take of this case and in view of the fact that most of these points pray for the compulsory direction by the court to the jury, we cannot affirm any of them. We therefore disaffirm all the points of the defendant; and with these remarks we leave the case in your hands.[4 to 11]

Arguments.

—The jury returned a verdict for the plaintiff for $24. A rule for a new trial having been discharged, judgment was entered on the verdict; whereupon the defendant took this appeal, assigning for error:

1–3. The parts of the charge embraced in [ ] [1 to 3]

4–11. The refusal of defendant's points. [4 to 11]

*Mr. F. W. Wheaton* (with him *Mr. Thomas Darling* and *Mr. J. V. Darling*), for the appellant:

1. Under the usage by which the turning in of the laborer's time by his employer, the miner, was treated as an order on the defendant company, the company's engagement was a qualified one, and its liability to pay did not become the subject of a suit until the succeeding pay-day, and only then if there were a balance in its hands due to the miner: Plymouth Coal Co. v. Kommiskey, 116 Pa. 370. It is conceded that the act of May 23, 1887, P. L. 180, prescribing semi-monthly pay-days, has no application to this case, because in no event would the defendant be liable thereunder, even as an employer, until December 15th, and this suit was brought on December 5th.

2. In propounding a distinction between a laborer who remains at work, and one who quits, with reference to the applicability of the usage by which wages are not due until the regular pay-day, the court assumed that the relation between the defendant and the plaintiff was that of employer and employee. Even if such a distinction holds good in a case where such a relation exists, it has no application in the present case. The testimony of Dennis, that he had known of cases in which men were paid before the pay-day, is insufficient to establish a custom to that effect: (1) Because he does not say that laborers were ever thus paid; (2) because evidence of the practice of the company, in particular instances, is not sufficient to establish a custom: Burger v. Insurance Co., 71 Pa. 422; and (3) because the testimony of a single witness is insufficient for that purpose: Wood v. Hickok, 2 Wend. 501.

There was no appearance for the appellee at the argument. In a brief filed by *Mr. T. A. Martin*, it was contended that there was evidence for the jury of the existence of the contractual relation of master and servant between the defendant and

the plaintiff, so that the former was primarily liable to the latter; and that this case was thereby distinguishable from Plymouth Coal Co. v. Kommiskey, 116 Pa. 370:—citing Rummell v. Dilworth, 111 Pa. 346; and that a custom postponing payment of wages for two thirds of a month after they are earned, is unreasonable:—citing Coxe v. Heisley, 19 Pa. 245.

OPINION, MR. JUSTICE CLARK:

Whether James Fairfield was employed, directly, by the Wyoming Valley Coal Company, or by William Dennis, who mined coal under a contract with the company, was of course, under all the evidence, a proper question for the jury. If the verdict of the jury was rendered upon a finding that Fairfield was directly in the employment of the company, and not of Dennis, the questions raised upon the assignments of error would be unimportant. But the verdict, under the charge of the court, may have been, and probably was, rendered upon an entirely different theory as to the facts. The charge of the court proceeds mainly upon the assumption that Fairfield was a laborer, employed by Dennis; that there was no contractual relation existing between Fairfield and the company, other than would result from the usage of the company in the payment of laborers when their time was turned in by the miners by whom they were employed; and it must be conceded that the testimony throughout is reasonably consistent with this view of the case.

If the contract of the company was with Dennis to mine coal by the car or other quantity, and Dennis employed Fairfield to assist him, at the rate of $1.50 per day, Fairfield would, in the absence of any usage or agreement of the company to a different effect, have to look to Dennis for payment. But it is alleged that there existed, not a general custom, technically so called, but an arrangement or usage of the company, established for the convenience and benefit of all parties interested, by which the miner, at the end of each month, was to " turn in " to the company the amount due to his laborers, and the company should charge the account of the miner, and pay the amount to the laborer himself. Under this general mode of conducting the business, as was said in Plymouth Coal Co. v. Kommiskey, 116 Pa. 365, the " turning in " of the laborers'

time by the miner was in legal effect an order on the company to pay the amount; and the company, recognizing this mode of settlement between the miner and his men, paid the men as if they had been in the company's service. The testimony shows that the time was turned in about the first of each month for the month preceding, while the pay-day was on the Saturday occurring nearest to the twentieth of the month. This time was accorded, doubtless, to enable the company to examine the accounts, post their books, and prepare the vouchers for payment.

The plaintiff was paid his wages for the month of October; they were turned in by Dennis on the first of November, and were paid on the next succeeding pay-day. On the second day of December he demanded payment of the company for the month of November, stating that he was "going to leave." His time had been turned in, but the pay-day was not until the twentieth, and the company declined to pay. What their reasons were it is unnecessary to consider, for, if the company was not obliged to pay in advance of the regular pay-day, that, of itself, was a sufficient reason.

The learned judge of the court below seems to have supposed that, because Fairfield was going to leave, he was not bound by the regulation as to the time of payment. He says: "The rule is applicable to the parties while the relation lasts of employer and employee. But, if for any reason the relation terminates, and there is a certain amount of money due the employee for wages, then and in that case it becomes immediately payable, and the employee is not obliged to wait two thirds of a month later, if he wishes to remove elsewhere or seek other employment. This, in our judgment, after a careful consideration, is the fair and just exposition of the law on this subject; and, of course, it controls our judgment in this case." Whether this would be so, if the relation of employer and employee had existed between these parties, it is unnecessary to decide. It must be observed that, upon the theory of the facts upon which we are now considering the case, no such relation existed. The company employed Dennis, and Dennis employed Fairfield. Dennis was not quitting the employment of the company, and certainly Fairfield's rights were not in any sense superior to those of his employer. If the turning in

of Fairfield's time was equivalent to an order upon the company to pay the amount, the acceptance of it, under the general usage and understanding, was an undertaking to pay at the regular pay-day, and not sooner. If Fairfield wanted his money sooner, he was obliged to look to his employer, and not to the company.

This method of keeping the accounts of the miners and their men, is in the interest of, and in part at least for the protection of the laborer. He is thus made secure in his wages, and can rely upon a certain day for payment; but, as he has no contractual relation with the company, excepting such as arises under the usage of the company, he has no right to demand payment of his wages before they are due and payable, according to its terms.

The judgment is reversed.